## Case No. 11,269.

### POOL v. WELSH.

[Gilp. 193.] [1]

District Court, E. D. Pennsylvania. Dec. 31, 1830.

SEAMEN — DISCHARGE IN FOREIGN PORT — THREE MONTHS' WAGES — LIBEL BY SEAMAN — ACT FEB. 28, 1803—PAYMENT TO CONSUL.

1. The payment of three months' wages, under the act of 28th February, 1803 [2 Stat. 203], is confined to cases of the voluntary discharge of seamen in a foreign port.

[Cited in The Dawn, Case No. 3,665.]

2. When a voyage is broken up without necessity in a foreign port, and the seamen are discharged, without payment to the consul of the three months' wages required by the act of 28th February, 1803, the court will, on a libel of the seamen, compel the owner to pay the three months' wages, two thirds to the seamen, and the other third for the use of the United States.

[Cited in The Dawn, Case No. 3,665.]
[Cited in Wilson v. Borstel, 73 Me. 275.]

3. It may be doubted, however, whether the intention of congress was to require or permit the payment to be made, elsewhere than to the consul at the port of discharge.

On the 18th June, 1829, the libellant [Joseph Pool] shipped at Philadelphia as a seaman on board the brig Juniata, bound to Antwerp and thence to Cadiz, his wages being fourteen dollars a month. On the 4th August, the vessel, having left Antwerp, encountered a gale by which she was driven ashore, near Flushing. While lying there, the mainmast was cut away, and the vessel continued for some days embedded in the sand. A survey was made by two captains of American vessels then at Flushing, who decided that "the expense of getting her off, and the necessary repairing, would amount to more than the value of the vessel after being so repaired." On the 15th August, she was, however, got off, and proceeded to Antwerp, a distance of seventy miles, where she arrived on the 17th. After a fresh examination, the captain deter-

[Reported by Henry D. Gilpin, Esq.]

mined to abandon the voyage on account of the state of the vessel, although no new survey appears to have been made. He informed the sailors of this determination, and advised them to ship on board of another vessel. The American consul also offered to provide passages for them to the United States, in American vessels, they doing duty on board of them. This was not accepted by the libellant, and some of the rest of the crew, who demanded the two months' pay allowed by law on the discharge of an American seaman in a foreign port. On the refusal of such payment, and the sale of the hull and spars of the vessel in their damaged state, which occurred soon after, the libellant returned by way of England to the United States. On the 19th March, 1830, the libel of the libellant was filed, claiming from the respondent [John Welsh], as owner of the brig, three months' wages, two thirds thereof to be paid to himself, and the other third to remain for the use of the United States. The answer of the respondent denied his liability, on the ground that the discharge of the libellant at Antwerp was not voluntary, but resulted from unavoidable necessity, the brig not being in a capacity to perform the residue of her voyage. On the 31st December, 1830, the case came on to be heard before Judge HOPKINSON. Evidence was offered by the respondent to prove that the vessel was so much injured as to be unworthy of repair, and that the voyage was abandoned from necessity. The libellant, on the other hand, produced testimony to show that, in fact, the injury by reason of her running ashore, might have been repaired, at comparatively small expense, on her return to Antwerp; and that, therefore, the abandonment of the voyage, and discharge of the crew, were not absolutely necessary.

Mr. Broom, for libellant.

The claim of the libellant is founded on the third section of the act of 28th February, 1803, which provides, that whenever a vessel belonging to a citizen of the United States, is sold in a foreign country, and her company discharged, or when a seaman who is a citizen of the United States, is discharged with his own consent in a foreign country, the master must exhibit to the consul the certified list of his ship's company, and pay to the consul for every seaman designated on the list as a citizen of the United States, and so discharged, three months' pay above his wages due, two thirds of which the consul is to pay to the seaman on his engagement on board of any vessel to return to the United States, and the other third he is to retain for the fund for the maintenance of destitute American seamen. It is not denied that the libellant was discharged, and no three months' wages paid. Does the respondent establish a sufficient legal reason for their not being paid? If the necessity of the discharge can ever afford one, it must at all events be

necessity of the most urgent kind; not such as will enable a merchant. desirous of changing his voyage, to get rid of his seamen without expense. He must have no option. His vessel must be a wreck. If he can repair her he must do so; or if he does not choose, he must provide for his seamen, who are thrown ashore destitute, by a contrary determination. If he is bound, as he undoubtedly is. when his vessel is damaged, to send on the cargo to its place of destination; so is he bound to provide, in the manner the law has pointed out, for the future welfare of his crew. with whom his contract has been suddenly broken. But does the law admit even the absolute necessity of abandoning the voyage, to be a ground for discharging the seamen without any future provision? A previous section seems to designate the only circumstances under which a captain is allowed to leave a seaman, without such provision, in a foreign country, and they are when he dies. absconds, or is forcibly impressed into other service. It does not include the abandonment of the voyage, even when caused by necessity, because it was intended that a provision for such an event should always be made. The owner is to calculate for it exactly as for the other expenses of his voyage; it is as much part of them as are the wages stated in the shipping articles. It is not to be regarded as a penalty for a default, but a contribution incident to navigation. It may be further observed, that although the act of congress declares that the three months' wages shall be paid by the master, and to the consul, yet, that if they are not so paid, and the master has returned, they may be recovered here from the owner, or they will be entirely lost, and the law violated with impunity. 2 Story's Laws, S·3. 884; Abb. Shipp. 146, 240; Emerson v. Howland [Case No. 4,441]; Spurr v. Pearson [Id. 13.268]; Orne v. Townsend [Id. 10,583]; Kimball v. Tucker, 10 Mass. 192; Reid v. Darby, 10 East. 143; Sheriff v. Potts, 5 Esp. 96.

Mr. Grinnell, for respondent.

When this libellant was discharged, the captain and the consul took every means to procure for him a speedy return to his own country. His discharge was the result of a misfortune, not of any unjust or unkind act. He has arrived safely here. Is the owner of the vessel. who has already lost so much, to pay this additional charge, namely, forty-two dollars for every seaman, whom nothing but shipwreck. the act of God, prevented him from longer protecting? If so, the provision of the law must be unquestionable. But it is not. 1. It does not extend to the owner, but is confined to the master; the payment is to be made by him, and properly so, for he is the person who discharges the seamen, his is the act which makes the payment necessary, it is one over which the owner has no control. 2. It provides that the payment is

to be made to the consul, not to the seaman. It is part of a general system by which funds are provided abroad for destitute seamen. If the master neglected his duty, it was the fault of the consul, who could have compelled its performance on the spot. If the master and the consul both omitted to comply with, or enforce the law, the owner here. who did not cause, and could not prevent such omission. is not to be punished. 3. It never was intended to apply to a case like this. The law regards only cases of voluntary discharge; this was involuntary, owing to the inability of the vessel to perform the voyage. Two events are provided for, the sale of an American vessel in a foreign port, and the discharge abroad of an American seaman with his own consent; in these cases, and in these only, the law interposes to protect the seaman from his own imprudence. To exact additional sums of money from an American merchant who had already lost his vessel by shipwreck, never was contemplated; to make him pay additional wages, when all his freight, the mother of wages, was lost. never was intended. Now the evidence is conclusive, to show that this was not "a sale of the vessel," for she had become a mere wreck; nor was it a discharge of the libellant "with his own consent," for he refused the terms offered by the master and consul. It was in fact a termination of the contract by sheer and absolute necessity; by an act of Providence, which no human prudence could foresee or prevent. Abb. Shipp. 444; The Saratoga [Case No. 12,355]; U. S. v. Mitchell [Id. 15,791]; Ogden v. Orr, 12 Johns. 143; Van Beuren v. Wilson. 9 Cow. 158; Hamilton v. Mendes, 2 Burrows, 1198, 1209.

HOPKINSON, District Judge. By the third section of the act of congress of 28th February, 1803 (2 Story's Laws, 883 [2 Stat. 203]), it is enacted "that whenever a ship or vessel belonging to a citizen of the United States shall be sold in a foreign country, and her company discharged: or when a seaman or mariner, a citizen of the United States, shall, with his own consent, be discharged in a foreign country, it shall be the duty of the master to produce to the consul, the list of the ship's company," and "to pay to such consul, for every seaman three months' pay over and above the wages which may be due him; two thirds thereof to be paid by such consul to each seaman or mariner so discharged, upon his engagement on board of any vessel to return to the United States. and the other remaining third to be retained to create the fund" therein named. The object and policy of this enactment seems to be, not only to provide the means of the return of every American seaman to the United States, but to induce him to return, by making his engagement on board of a vessel to return to the United States, a condition upon which he is to receive his two thirds of the three months' wages paid to the consul. By the plain terms of the law, too, this money

is to be paid by the master to the consul in the foreign port, who is made the trustee or agent of the United States, as to one third part of the amount paid to him, and of the seaman as to the other two thirds; and it is his duty to account to each of these parties for their respective proportions. It is also to be observed, that the part reserved for the United States is appropriated, by the act, to the "purpose of creating a fund for the payment of the passages of seamen or mariners, citizens of the United States, who may be desirous of returning to the United States, and for the maintenance of American seamen who may be destitute, and may be in a foreign port." The act further directs, that the sums thus retained for this fund, shall be accounted for with the treasury every six months. Thus it would seem, that not only the terms of the law, but the objects to be attained by it, to wit, the return of American seamen to their country, and their maintenance when found destitute in a foreign port, all require that this money shall be paid to the consul in the foreign port, where the seaman is discharged, and that no other payment or obligation to pay is recognised or created by the act.

I confess that this would be my opinion if the question came up in this case for the first time, and of course I should consider that no recovery of this additional sum could be had, either from the master or the owner of a vessel here. The court would make itself a volunteer unauthorised trustee of a public fund, without any legal direction for the disposition of it. The case of Emerson v. Howland [supra], reported and recognised in Judge Story's edition of Abbott on Shipping, (page 146,) has been cited to prove the right of recovery here from the owners of the vessel. It was a suit in the admiralty against the owners of a ship for subtraction of wages. The facts were that the seaman was shipped at Norfolk on a voyage to Liverpool, and thence to one or more ports in Europe, and back to the United States. She arrived at Liverpool, and sailed for Archangel, and while on that voyage was captured by a Danish cutter. The ship was finally restored; but ten days before the restoration, the captain discharged all his crew, under the pretence that they refused to remain any longer, and either had deserted or intended to desert. The ship did not pursue her voyage to Archangel, under the pretence that a suitable crew could not be obtained. She took in a cargo and went to Ireland, and thence to Liverpool, and from thence returned to the United States. The libellant received his discharge with the rest of the crew in Denmark, and the captain gave him a due bill for the amount of his wages up to that time. The claim was for wages to the time of the actual return of the ship to the United States, which was the termination of the voyage described in the articles. On the other side it was contended that the seaman was entitled to wages only to the time of his discharge. By this statement of the

case, it appears that no question under the act of congress of 28th February, 1803, was involved in it. Nothing was demanded under that act; the circumstances did not bring it within the act. It does not appear that the seaman was discharged by his own consent. It is said that the captain discharged the crew under the pretence that they would desert. The expression implies that this was not the real cause, and without it there is no pretence of any consent on the part of the seamen to their discharge. This charge of insubordination, at least so far as it concerned the libellant, was repudiated by the certificate given by the captain at the time of his discharge, in which he speaks with approbation of his conduct, and states that he has been captured, and was under the necessity of discharging him. This necessity in the common understanding of the language, would be referred to the capture, and not to any menace of desertion on the part of the seaman. In this respect, therefore, that case did not fall under the provisions of the act of congress; nor did the claim of the libellant so consider it. The three months' additional wages were not demanded, but only what was considered to be due under, and by virtue of the contract, to wit, full wages to the end of the voyage.

On the conclusion of the argument by the counsel of the parties, Judge Story, before he decided the case, which he reserved for further consideration, threw out this observation; "In future, where seamen are discharged in a foreign port, I shall decree against the owners the whole of the three months' wages, authorised and required to be paid by the statute of 28th February, 1803. The practice has heretofore been to allow only the two months' wages which belong to the mariner. But the owner ought not to be in a better situation than if he had complied with the terms of the law; and it is the duty of the court to see that it is enforced. The additional month's wages will not, however, be paid over to the mariner, but retained in the registry for the use of the United States, to be applied according to the regulations of the statute." There is certainly not the cautious discrimination in the terms of this declaration, struck off in the course of a trial, which characterises the deliberate opinions of this learned judge. He says, "whenever a seaman is discharged in a foreign port," he will give the additional three months' wages, two of them to the seaman, and the third to the United States. But assuredly he would inquire whether the discharge is such a one as is expressly described in the act of congress; that is, "with the consent of the seaman." He would not, as his language imports, in every case of a discharge in a foreign port, without inquiry for what cause it was done, apply the remedy of the act of congress, which is given only to a discharge of a specified description, leaving the seaman to his ordinary rights and remedies for a discharge of another description. The judge says, that in a future case he

would so decree; but no such decree appears to have been made by him, unless it may be found in the manuscript case in the Massachusetts circuit court, referred to in Abbott on Shipping, but not reported. In a note to his last edition of that work (page 443,) the judge again repeats his opinion, or declaration, made in the case of Emerson v. Howland [supra]. He adds; "But it has been decided that a seaman cannot recover, in a suit at common law, the whole or any part;" and he cites the case of Ogden v. Orr, 12 Johns. 143. Before I turn to that case I will remark, that I presume there can be no difference between the duty of a common law and an admiralty court, in the construction of an act of congress. The object of both courts must be the same, to understand the law truly, as it was intended by the legislature, and to execute it according to that understanding. The case of Ogden v. Orr, in the supreme court of New York, was an action of assumpsit, for wages claimed by the plaintiff, as a seaman, and also for a breach of the shipping articles. The plaintiff had been discharged from the ship at Lisbon, and his demand was founded on the act of congress we have referred to. The plaintiff had left the vessel voluntarily, and with the master's consent, and had received his wages to the time of his discharge. The inferior court had given judgment for the plaintiff; but the supreme court thought there was an error in the construction of the act of congress. After reciting the statute, the court proceeds; "Assuming that the plaintiff below was discharged with his own consent, the question is, whether he can maintain an action for his two thirds of the three months' wages required, in such cases, to be paid by the master. The act directs it to be paid to the consul; it creates no obligation on the master to pay it to the seaman; and the policy of the law seems to have been, that the money shall pass through the hands of the consul, who is made, in some measure, the guardian of American seamen in foreign parts, for the purpose of protecting their rights, and relieving their wants. This three months' pay was intended as a kind of penalty, and to create a fund for a benevolent purpose. It is likewise taking from the consul a commission to which he is entitled by the act. Besides, this is a suit against the owner, and not against the master of the vessel." This judgment of the supreme court of New York was rendered in January, 1815; the dictum of Judge Story was delivered in May, 1816. It is probable that the case of Ogden v. Orr was not then known to the circuit court of Massachusetts. It does not appear to have been noticed either by the counsel or the court; and the volume containing it was not published until some time in 1816.

With these views of the subject it would be my duty to dismiss this libel, if the case did not present itself to the court under the protection of a judge who is entitled to high respect from every court, and especially upon a question of the description of that now under consideration. I am always unwilling to disturb such opinions, although they do not come in the shape or with the authority of judicial judgments. It is very desirable that an uniformity of decision, particularly on the construction of acts of congress, should prevail in the courts of the United States; and to this object I would yield much of my own opinions. If the dictum of Judge Story may be thought to have been hastily thrown out, yet we find he holds to it in the notes in his edition of Abbott on Shipping, already cited, (pages 145, 443.) I cannot but hesitate to oppose myself, without a more deliberate examination of the question, to this learned and enlightened judge, and therefore have reluctantly determined to sustain this suit; but, at the same time, I shall not hold myself to be bound by this decree, if at any future time, on a more full argument, or by my own more mature deliberation, I shall find my own impressions of the law to become deeper and stronger. As to the facts of the case, it is clear to me that no such necessity existed for breaking up the voyage and discharging the crew, as will take from it the character of voluntary discharge. The vessel was not greatly damaged by going on shore; or, certainly not so much so but that she might have readily been put in a condition to proceed on her voyage.

Decree: That the three months' wages be paid by the respondent; two thirds thereof to be paid to the libellant, Joseph Pool, and one third for the use of the United States, with costs.